SMITH *v.* LAKE SHORE & MICHIGAN SOUTHERN RAILWAY CO.[1]

1. RAILROAD COMPANIES — FAMILY MILEAGE — INTERSTATE COMMERCE—STATUTES.

Act No. 90, Pub. Acts 1891, requiring railroad companies in this State to keep for sale 1,000-mile tickets "at a price not exceeding $20 in the Lower Peninsula and $25 in the Upper Peninsula," to be issued in the names of the purchaser, his wife and children, and to be valid for two years after date of purchase, does not contemplate a sale of mileage which shall be good outside of the State,—the reference to locality being designed, not to fix the place where the tickets are to be placed on sale, but to indicate the price of 1,000 miles of transportation in the respective peninsulas; and it is, therefore, not unconstitutional as an attempted regulation of interstate commerce.

2. SAME — SPECIAL CHARTER — EFFECT OF CONSOLIDATION UNDER GENERAL LAW.

The Michigan Southern Railroad Company was organized prior to the adoption of the present Constitution, under a special charter. By successive consolidations with connecting lines in neighboring States, the last being effected under Act No. 82, Laws of 1855, it became a part of the Lake Shore & Michigan Southern Railway Company. Section 50 of the act mentioned authorized the consolidation of continuous or connecting lines "into a single corporation," and declared that the "new corporation" should possess all the powers, rights, and franchises conferred upon the lines so consolidating, and should be subject to the restrictions and perform the duties imposed by their respective charters not inconsistent with such act. Section 52 provided that, upon the election of the first board of directors of the corporation so created, the rights and interests of each of the corporations should be deemed to be transferred to and vested in such "new corporation," and that such "new corporation" should hold the same in the same manner as if the respective corporations had continued to retain the title and transact the business of such corporations. *Held,* that the Michigan Southern Railroad Company, by the consolidation with other lines under a

---

[1] Rehearing denied November 23, 1897.

law the terms of which clearly indicated that the consolidated company should constitute a new corporation, lost its special privileges under its charter, and became subject to the general law,—the act of consolidation,—as limited by the constitutional provision, in force at the time, reserving to the legislature the right to amend, alter, or repeal corporate charters.

3. SAME—RATES OF CHARGES — LEGISLATIVE CONTROL — CONSTITUTIONAL LAW.

*It seems* that the effect of the amendment to the Constitution (article 19*a*, § 1 ) which provides that the legislature may, from time to time, pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on different railroads in the State, was not to limit the legislative authority over rates of transportation to the power to fix maximum rates.

4. SAME—MAXIMUM RATES.

In any event, the term "maximum rate," as used in the amendment, means the maximum rate permissible under a given set of circumstances; therefore, a statute requiring railroads to issue family mileage, good for two years, at a price not to exceed a specified sum, is valid, though a maximum rate for single transportation is also fixed by the same statute.

5. SAME—CORPORATE CHARTERS—RIGHT TO AMEND.

The authority for such legislation with respect to corporations organized subsequent to the adoption of the Constitution, and prior to the amendment of 1870, above quoted, may be found in the power reserved to the legislature by the Constitution to amend and repeal corporate charters, *unless* the legislation in question can be construed as an invasion of property rights, prohibited on constitutional principles.

6. SAME—INVASION OF PROPERTY RIGHTS—TIME CONTRACTS.

It is *held* that the requirement that railroad companies shall enter into such contracts for future transportation, covering a period of two years, is not an unconstitutional invasion of their property rights.[1]

7. SAME—COMMON METHODS OF BUSINESS—JUDICIAL NOTICE.

In arriving at the above conclusion, the court took judicial notice of the fact that nearly every railroad in the State was issuing mileage tickets similar to those in controversy.

GRANT and HOOKER, JJ., dissenting.

---

[1] The legislative power to fix tolls, rates, and prices is the subject of an extensive note to *Winchester, etc., Turnpike Road Co.* v. *Croxton,* (Ky.) 33 L. R. A. 177.

*Certiorari* to Lenawee; Lane, J.  Submitted June 19, 1896.  Decided October 1, 1897.

*Mandamus* by Henry C. Smith to compel the Lake Shore & Michigan Southern Railway Company to issue a family mileage book.  From an order granting the writ, respondent brings *certiorari*.  Affirmed.

*Watts, Bean & Smith* (*Fred A. Maynard*, Attorney General, of counsel), for relator.

*Ashley Pond, A. C. Angell*, and *C. E. Weaver* (*George C. Greene*, of counsel), for respondent.

Montgomery, J.  The relator applied to the respondent company for a 1,000-mile mileage book, to be issued in the name of himself and wife, and was refused.  He thereupon brought this proceeding in the circuit court, to compel the respondent to issue such a ticket.  The circuit judge granted an order that a ticket good upon the lines of the respondent in this State be issued, and this order is the one now under review.

The action is based upon the amendment to section 9 of the railroad law, adopted and embodied in Act No. 90 of the Public Acts of 1891, which contains the following provision:

"One thousand mile tickets shall be kept for sale at the principal ticket offices of all railroad companies in this State, or carrying on business partly within and partly without the limits of this State, at a price not exceeding twenty dollars in the Lower Peninsula and twenty-five dollars in the Upper Peninsula.  Such one thousand mile tickets may be made nontransferable, but, whenever required by the purchaser, they shall be issued in the names of the purchaser, his wife and children, designating the name of each on each ticket.  * * *  Each one thousand mile ticket shall be valid for two years only after date of purchase."

In the same section of the statute it is provided that the rates of fare shall not exceed 2 cents a mile for carriage of

passengers by railroads whose gross earnings are more than $3,000 per mile, $2\frac{1}{2}$ for roads whose gross earnings are more than $2,000 and less than $3,000, and for com-. panies whose earnings are less than $2,000 per mile 3 cents per mile, except in the Upper Peninsula, where a higher rate is permitted.

It is contended that there was error in the ruling below, and various grounds are alleged, as follows ·

(1) That the statute is an attempt on the part of the legislature to provide for the sale of mileage which shall be good outside of the State, and that, as this affects interstate commerce, it is unconstitutional.

(2) That the charter of the Michigan Southern Railroad Company, passed in 1846 (Act No. 113, Laws 1846), which provided that "it shall and may be lawful for said company, from time to time, to fix, regulate, and receive the tolls and charges taken for the transportation of property and persons on said railroad as aforesaid : * * * _Provided_, said company shall charge no greater sum or tolls for the transportation of persons or property than were charged or authorized by the State of Michigan to be taken on the Southern Railroad on the first day of January last,"—is still in force, and, as it was granted prior to the adoption of the Constitution reserving the right to alter or amend charters of corporations organized under the laws of the State, that the legislation in question impairs the obligation of contracts, within the doctrine of the _Dartmouth College Case_, 4 Wheat. 518, and is, for this reason, invalid.

(3) That, independent of this provision, the act is unconstitutional, for the reason that it is an attempt to compel railroad companies to enter into contracts to be performed in the future, at any time within two years, and is an invasion of the right to the use of property; and, in the same connection, that this is in violation of the fourteenth amendment of the Constitution of the United States, which provides that no person shall be deprived of property without due process of law.

(4) That the amendment to the Constitution (article 19$a$, § 1) is a limitation upon the power of the legislature to legislate as to rates of charges for transportation, and limits the right in that regard to the fixing of·_maximum_ rates, and that the provision for the issuing of a mileage

book is not a fixing of *maximum* rates of charge, but is a further regulation.

1. The first contention cannot be allowed, for the reason that the statute, fairly construed, was intended to limit the use of the mileage ticket to the State of Michigan. It fixes the price of the ticket,—not exceeding $20 in the Lower Peninsula, and $25 in the Upper Peninsula. While the language is not very apt, we think it was the clear intention that a ticket, the price of which should be $20 for 1,000 miles of transportation, would be one entitling the purchaser to carriage in the Lower Peninsula of Michigan, and one at $25 to carriage in the Upper Peninsula, and that it was not the intention by this reference to locality to fix the place where the tickets should be placed on sale. Thus construed, the statute cannot be held to be a regulation of interstate commerce.

2. The answer of respondent sets out that in 1846 a special charter, containing the provisions above quoted, was granted to the Michigan Southern Railroad Company; that subsequently the Michigan Southern Railroad Company, under an act of the legislature of the State of Michigan, became consolidated with a corporation of the State of Indiana, known as the Northern Indiana Railroad Company, thereby forming the Michigan Southern & Northern Indiana Railroad Company, which company then succeeded to all the rights, franchises, property, and powers of the Michigan Southern Railroad Company; and that the Michigan Southern & Northern Indiana Railroad Company afterwards, under due legislative authority in that behalf, entered into consolidation with certain other railroad companies, organized under the laws of Indiana, Ohio, Pennsylvania, and New York, respectively, and thereby formed the said respondent, the Lake Shore & Michigan Southern Railway Company; and that this respondent thereby acquired all the rights, franchises, powers, and property of the Michigan Southern Railroad Company and the Michigan Southern & Northern Indiana Railroad Company, and holds and is entitled

to all the rights, franchises, powers, and privileges granted in and by the charter aforesaid, and by the acts of the legislature of the said State.

The last consolidation set up was under Act No. 82 of the Laws of 1855, entitled "An act to provide for the incorporation of railroad companies." Section 50 provides that—

"Any railroad company in this State, forming a continuous or connected line with any other railroad company, may consolidate with such other company, either in or out of this State, into a single corporation.    *   *   * Such new corporation shall possess all the powers, rights, and franchises conferred upon such two or more corporations, and shall be subject to all the restrictions and perform all the duties imposed by the provisions of their respective charters or laws of organization, not inconsistent with the provisions of this act."

By section 52 it is provided that—

"Upon the election of the first board of directors of the corporation created by said agreement, all and singular the rights and franchises of each and all of said two or more corporations, parties to such agreement, all and singular their rights and interests in and to every species of property and things in action, shall be deemed to be transferred to, and vested in, such new corporation, without any other deed or transfer; and such new corporation shall hold and enjoy the same, together with all the right of way and all other rights of property, in the same manner, and to the same intent, as if the said two or more corporations, parties to such agreement, should have continued to retain the title and transact the business of such corporations."

It is contended by the respondent that, under this statute, where a consolidation takes place of a corporation organized and existing under a special charter, as did the respondent company, with a corporation or corporations existing under the laws of another State, the effect is not to annihilate the previously-existing Michigan corporation, but that, upon the consolidation, the original corporation

brings to the new entity the powers and privileges already possessed, and that the consolidated company simply exercises in each jurisdiction the powers the corporation there chartered had possessed, and succeeds there to its privileges. The learned counsel for respondent cite, as sustaining this view, *State Treasurer* v. *Auditor General*, 46 Mich. 224; *Chicago, etc., R. Co.* v. *Auditor General*, 53 Mich. 79; *Nashua, etc., R. Co.* v. *Boston, etc., R. Co.*, 136 U. S. 356; *People* v. *New York, etc., R. Co.*, 129 N. Y. 474.

Passing the consideration of these cases for the time, and having reference to the terms of the act under which the consolidation took place, it is to be observed that this act constituted the consolidated entity a "new corporation," if we regard the terms employed in the statute, in section 50, above quoted, which limits the rights and franchises derived from the old corporations, and to be exercised by the new, to such as are not inconsistent with the provisions of the act; and in section 52, relied upon by respondent as well, the new creation is referred to as "such new corporation." It is also a corporation created under a general law. At the time of its creation, section 1 of article 15 of the Constitution provided that corporations might be formed under general laws, and that "all laws passed pursuant to this section of the Constitution may be amended, altered, or repealed." It was said in *Muller* v. *Dows*, 94 U. S. 444, of such a corporation, so formed: "The two companies became one, but in the State of Iowa that one was an Iowa corporation, existing under the laws of that State alone."

In *State Treasurer* v. *Auditor General*, 46 Mich. 224, and *Chicago, etc., R. Co.* v. *Auditor General*, 53 Mich. 79, the question was as to what portion of the earnings of the consolidated company was subject to taxation in this State. In *State Treasurer* v. *Auditor General* it was held that the Lake Shore & Michigan Southern Railway was not a corporation formed under the general railroad law, within the meaning of the clause of the statute providing for

taxing railroad companies so formed. In *Chicago, etc., R. Co.* v. *Auditor General* the same doctrine was held. It was said in the latter case:

"We appreciate very fully the difficulty of determining under all circumstances in what light we are to regard the anomalous organizations which are formed by the consolidation of two or more corporations which have received their corporate powers from different sovereignties."

The case of *Peik* v. *Railway Co.*, 94 U. S. 164, was cited with approval. In that case it was held that the State in which the road lay might legislate for the consolidated company in that State precisely as before the consolidation. Neither of the two Michigan decisions determined what legislative control the legislature of the State has over that portion of the road which lies within the State, or as to the conduct of business within the State. And this may also be said of *People* v. *New York, etc., R. Co.*, 129 N. Y. 474.

The companies at present forming the respondent derived rights under the law permitting a consolidation, and, while there may be difficulty in subjecting so much of the property of the consolidated company as lies without the State to our jurisdiction, or in controlling the transactions of the corporation itself without the State, or in fixing taxation upon a basis which rests upon its earnings outside the State, it is not apparent why the company, as to its exercise of corporate functions within the State, is not subject to the terms of the act authorizing its consolidation, as limited by the constitutional provision in force at the time, or why it is not subject to local legislation.

Counsel also cite the cases of *Tomlinson* v. *Branch*, 15 Wall. 460, and *Central Railroad & Banking Co.* v. *Georgia*, 92 U. S. 665. In the former case the act provided that, upon the written consent of all the stockholders of the South Carolina Canal & Railroad Company, the said South Carolina Canal & Railroad Company *should*.

*be merged in the said South Carolina Railroad Company.* It was held that the South Carolina Railroad Company retained the rights which it had before the merger. The case of *Central Railroad & Banking Co.* v. *Georgia* was to the same effect. There the Macon & Western Railroad Company was merged under the *name and charter* of the said the Central Railroad & Banking Company of Georgia. But in *Atlantic, etc., R. Co.* v. *Georgia,* 98 U. S. 359, it was held that, where a consolidation took place, the effect was the creation of a new corporation out of the stockholders of the two previously-existing corporations. It was said: "The consolidation provided for was clearly not a merger of one into the other, as was the case of *Central Railroad & Banking Co.* v. *Georgia,* 92 U. S. 665."

The question was raised in a case where this same respondent was a party in interest, in *Shields* v. *State,* 26 Ohio St. 86. In that case the court say:

"Among the companies forming this consolidation were two Ohio companies, chartered and organized before the adoption of the present constitution, and whose charters were, therefore, not subject to the provision of the present constitution which gives to the legislature the power of alteration, amendment, and repeal of charters. * * * The consolidation took place in 1869, and was effected in all respects in pursuance of the act of April 10, 1856; and the claim is that a consolidation under that act is to be regarded in law as a surrender or relinquishment of the several individual charters of the companies so uniting, and the acceptance of a charter *de novo* from the State."

The court held that the consolidation constituted a new corporation, and the fact that, it was formed out of old defunct corporations did not make it any the less a corporation created by the legislature. It was said: "It is not the material out of which it is formed, but the plastic hand which formed it, that we are to look to for its character and *status* under the constitution." This case was affirmed on appeal by the Federal Supreme Court in 95 U. S. 319.

The question was again before the federal court in *St.*

*Louis, etc., R. Co.* v. *Gill,* 156 U. S. 649. In that case there was a consolidation of two railroads, operating in Missouri and Arkansas. It was claimed that, notwithstanding this legislation, the railroad company, so far as related to its business in Arkansas, was entitled to fix its rates of charges in accordance with the law of its original incorporation. The court said: "It has been frequently decided by this court that a special statutory exemption or privilege, such as immunity from taxation or a right to fix and determine rates of fare, does not accompany the property in its transfer to a purchaser, in the absence of express direction to that effect in the statute;" thus treating the consolidation as a purchase by the new entity.

3. Passing by the third contention, and considering first the effect of article 19*a*, § 1, of the Constitution, this section reads as follows: "The legislature may, from time to time, pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on different railroads in this State," etc. The contention is that this section is a limitation upon the authority of the legislature, and that, as to the fixing of rates, the power is exhausted when maximum rates are established, and that the act in question is not a fixing of maximum rates within the constitutional provision.

In the opinion of Mr. Justice CAHILL in *Wellman* v. *Railway Co.,* 83 Mich. 592, at page 624, it is said:

"Nor do I think that the constitutional amendment of 1870, before cited, which expressly provides that 'the legislature may, from time to time, pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on different railroads in this State,' is more than declaratory of a power that already existed. * * * The amendment of 1870 was neither a grant nor a limitation of power. It was a declaration of power already reserved in the Constitution, and the amendment served only to put beyond question the right of the legislature, which was before thought to be open to debate."

The maxim, *"Expressio unius est exclusio alterius,"* is not wholly inapplicable in the interpretation of constitutional provisions. See End. Interp. Stat. § 533; Cooley, Const. Lim. (6th Ed.) 78, 79. Of this rule, as applied to the construction of constitutional provisions, Mr. Justice GREEN, speaking for the court in *Williams* v. *Mayor, etc., of Detroit,* 2 Mich. 563, said:

"That certain legal maxims or rules of construction, which have been found generally applicable, afford important aid in arriving at the intention of those who framed the law, every lawyer will admit; but that there are some instruments or laws to which such maxims cannot be strictly applied, without doing manifest violence to the plain intent of the framers of the law, is also a matter of common experience. This is especially true in the construction of state constitutions, as will appear manifest when we consider their character and objects."

See, also, *Com.* v. *Hartman,* 17 Pa. St. 118; *People* v. *Wright,* 6 Colo. 92; *In re Thirty-Fourth St. R. Co.,* 102 N. Y. 343.

The constitution of New York placed certain restrictions upon street-railway companies. The legislature, by a general act, embodied the constitutional conditions, and annexed a third or additional condition not enjoined by the constitution. In *Re Thirty-Fourth St. R. Co., supra,* the contention was made that the constitution had prescribed the conditions upon which street railroads might be constructed, and, by implication, thereby enjoined the imposition by the legislature of conditions other than those prescribed therein. The court said:

"But the constitution, neither by express language nor by implication, abridges the legislative power over the subject outside of the matters particularly enumerated. It needs no citation of authorities to sustain the postulate that, except as restrained by the constitution, the legislative power is untrammeled and supreme, and that a constitutional provision which withdraws from the cognizance of the legislature a particular subject, or which qualifies or regulates the exercise of legislative power in

respect to a particular incident of that subject, leaves all other matters and incidents under its control.   Nothing is subtracted from the sum of legislative power except that which is expressly or by necessary implication withdrawn. The legislature is prohibited from granting a franchise to construct a street railroad, except upon certain specified conditions.   But it is not prohibited from annexing further conditions not inconsistent therewith, and whether other conditions are necessary or proper is a matter resting in the wisdom and discretion of the legislature."

It is said that the statute having fixed the maximum rate at 3 cents as to certain roads earning less than $2,000 per mile, and $2\frac{1}{2}$ cents and 2 cents, respectively, for roads earning more than $2,000 per mile, this exhausts the power of the legislature, and that no power exists to provide for a less rate where mileage books are used.   In my judgment, the term "maximum rate," as used in this constitutional provision, means the maximum rate which the company is to be permitted to charge under a given set of circumstances.   Under the terms of this act, the company not furnishing mileage books may be compelled to furnish them at the rate of $2\frac{1}{2}$ or 2 cents a mile, respectively, or it may charge for the single fare 3 cents.   By this same act all roads, are entitled to charge 3 cents per mile for a distance not exceeding five miles.   It might be said with as much force as the proposition under discussion can be urged that by this provision the legislature has fixed the maximum rate at 3 cents, and thereby exhausted its power.   The answer is obvious, viz., that, in fixing the rate at 3 cents for a distance less than five miles (in the Lower Peninsula), the legislature fixed the maximum rate *for that service* to be paid the road by one *making just that contract.*   If this answer is not valid, the court and counsel in the *Wellman Case* overlooked wholly a controlling question, which would have ruled the case the other way from that in which it was decided.

In the case of *Interstate Commerce Commission v. Baltimore, etc., R. Co.*, 145 U. S. 263, section 2 of the

interstate commerce act was under consideration. That section provides that—

"If any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered in the transportation of passengers or property subject to the provisions of this act than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

The following language of Judge Jackson, of the circuit, was approved:

"To come within the inhibition of said sections, the differences must be made under like conditions; that is, there must be contemporaneous service in the transportation of like kinds of traffic under substantially the same circumstances and conditions. In respect to passenger traffic, the positions of the respective persons or classes between whom differences in charges are made must be compared with each other, and there must be found to exist substantial identity of situation and of service, accompanied by irregularity and partiality resulting in undue advantage to one, or undue disadvantage to the other, in order to constitute unjust discrimination."

4. It is difficult to define the precise limit of power reserved to the legislature under a provision embodied in the fundamental law, or incorporated in the charter of a corporation, reserving the right to the legislature to alter, amend, or repeal. The question has been before this court in numerous cases, the latest being the case of *Attorney General, ex rel. Dusenbury,* v. *Looker,* 111 Mich. 498, where the authorities are collated. In the case of *City of Detroit* v. *Detroit, etc., Plank-Road Co.,* 43 Mich. 140, Mr. Justice COOLEY, speaking of the provision of the Constitution of the United States which

forbids the impairing of the obligation of contracts, says that—

"But for this provision, the power to amend and repeal corporate charters would be ample without being expressly reserved. The reservation of the right leaves the State where any sovereignty would be if unrestrained by express constitutional limitations, and with the powers which it would then possess. It might therefore do what it would be admissible for any constitutional government to do when not thus restrained, but it could not do what would be inconsistent with constitutional principles. And it cannot be necessary at this day to enter upon a discussion in denial of the right of the government to take from either individuals or corporations any property which they may rightfully have acquired."

We think this is a fair statement of the effect of this reservation, and that, if the legislation in question can be construed as depriving the respondent of its property, it is invalid, as conflicting with other constitutional provisions. But we do not think that such is the effect of this legislation. It cannot be said that the right to use property dedicated to a public use in precisely the manner which the owner may choose to use it is a vested right of property. This question has been put at rest by a long line of decisions, beginning with *Munn* v. *People*, 69 Ill. 80, and including *Wellman* v. *Railway Co.*, 83 Mich. 592.

The chief contention is that because this statute requires the company to enter into contracts for future transportation of passengers, covering a period of two years, it is therefore withdrawing from the company the right to manage its own property, and is, for this reason, invalid. It may be said that every attempt to fix rates of toll, or rates for the carriage of passengers or transportation of property, to some extent involves an interference with the management and control of its property by the railroad company. Having in mind the common method of conducting railroad business at the present day, the court can take judicial notice of the fact that nearly every railroad in this State does issue, and did, prior to the enactment of this law, issue, mileage books or 1,000-mile tickets.

The conditions were not precisely the same, but they were contracts good for one year, and issued at a reduced rate; so that, in the usual conduct of business, time contracts for the transportation of passengers are made. In fact, it would be difficult to conceive of a method of conducting a railroad business which did not involve a contract good for some length of time.

In the brief of the learned counsel for the respondent we are cited to a large number of cases in which it has been held that it is competent for railway companies to make regulations limiting the time within which a ticket may be used, and this is undoubtedly true, in the absence of legislation; but we think it cannot be successfully contended that it would not be competent for the legislature to provide that a ticket furnished to a passenger should be good for a definite reasonable time, and, when such legislation was adopted, it would of necessity deprive the company of the power to make rules inconsistent therewith.

I confess I cannot share the apprehension that such a regulation as the one here involved will deprive the company of the management of its business. Would any one contend that the legislature has not the power to require railroad companies to keep on sale at their stations tickets of any kind? The compulsory requirement of this act may, indeed, be denounced as an attempt to conduct the business of the company, but I apprehend that extended argument is not necessary to defend the right of the legislature to make such requirement. In Elliott on Railroads (section 1598) it is said that "in some States it is provided by statute that tickets shall be good for a certain number of years, notwithstanding any limitation therein." I am not aware that these statutes have been attacked. If such enactments be within the power of the legislature, where is the line to be drawn short of that fixed by the Federal Supreme Court, which is that legislation of this character must not be so unreasonable as to deprive the company of the use of its property?

The only case to which our attention has been called in which the subject of legislation requiring the sale of mileage books has been under consideration is that of *Attorney General* v. *Old Colony R. Co.*, 160 Mass. 62. The legislation there under discussion provided for an interchangeable mileage book, good on all the roads of the State. The court divided, a majority of the court holding such legislation to be unconstitutional, in that it required one company to do business upon the credit of another. The majority of the court distinctly limit the decision to that ground, and apparently did not find a regulation requiring the issue of mileage books to be unreasonable. Mr. Justice Knowlton, with whom Mr. Justice Holmes concurred, reached the opposite conclusion, and of necessity affirmed the power of the legislature to provide for the issuing of mileage books.

My conclusions are that the regulation is not unconstitutional as applied to roads within the control of the legislature, and that the respondent road, by its consolidation, —formed, as it is, by a consolidation under an act passed since the enactment of the constitution reserving the power to alter, amend, or repeal,—is subject to the general control of the legislature, and that the judgment of the circuit court should be affirmed.

LONG, C. J., and MOORE, J., concurred with MONTGOMERY, J.

GRANT, J. (*dissenting*). By Act No. 90, Pub. Acts 1891, the railroad law was amended, fixing the maximum rate for the transportation of passengers at from 2 to 3 cents per mile, according to the gross earnings of the passenger trains of the various roads. The same act requires all railroad companies in this State, or carrying on business partly within and partly without the State, to keep for sale, at their principal ticket offices, 1,000-mile tickets, to be issued in the name of the purchaser, his wife and children, and to be valid for two years, at the rate of $20 in the Lower, and $25 in the Upper, Peninsula.

The relator tendered the respondent $20, and demanded a 1,000-mile ticket, to be issued in the name of himself and his wife. The respondent refused to accept the money and issue the ticket, whereupon the relator filed a petition in the circuit court for the county of Lenawee, praying for the writ of *mandamus* to compel the issuance of the ticket. The court below granted the order, and the respondent appealed.

The Constitution (article 19a, § 1) provides that "the legislature may, from time to time, pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on different railroads in this State," etc. One of the railroads doing business in this State contested in the courts the validity of the above provision fixing maximum rates. That provision of the law was held valid. *Wellman* v. *Railway Co.*, 83 Mich. 592. That decision held that the reasonableness of the rate was for the sole determination of the legislature, and not for the courts. The case was affirmed in the Supreme Court of the United States, that court, however, holding that the reasonableness of the maximum rate was for the determination of the courts, and not exclusively in the legislature, and that, whenever that rate was so low as to deprive the railroad companies of a reasonable income from their legitimate investments, the result was to deprive them of their property, or, what is the same thing, the use of it, without due process of law, and therefore void, under the Constitution of the United States. *Chicago, etc., R. Co.* v. *Wellman*, 143 U. S. 339. It is now the established rule that the question is a judicial one, and that, while the courts cannot establish the charges, they will inquire into their reasonableness, and determine whether the rates are such as to deprive the corporation of its property without due process of law. *St. Louis, etc., R. Co.* v. *Gill*, 156 U. S. 657, and authorities there cited.

But the above decisions, and many others upon the same subject which are cited in the briefs of counsel, do

not, in my judgment, bear upon the question now raised. All those cases involve the validity of maximum rates fixed by the legislatures under the implied or express power of the State constitutions. The difficulty which for a long time confronted the courts was not in determining whether the power to fix a reasonable maximum rate existed, but what was the limitation of the power. As late as 1893, the supreme court of Massachusetts, in *Attorney General* v. *Old Colony R. Co.*, 160 Mass. 62, 89, recognized the existence of the power, but said:

"It is not yet settled, however, what the limitations of this power are,—whether it is limited to such rates as a court may deem reasonable, or only to such rates as shall not operate to deprive the railroad companies of their property without reasonable compensation or without due process of law."

That question was settled in *St. Louis, etc., R. Co.* v. *Gill, supra*, decided in 1895. We are cited to no case, nor have I been able to find any, which involves a legislative enactment like the one now presented for our determination.

Several defenses are interposed, but I deem it important to refer to but one, which I think is conclusive against the relator, viz.: Does the legislature possess the power, under the Constitution of this State, to enact this provision, requiring railroad companies to fix charges below the maximum rates, and compel them to enter into contracts for two years, or for any number of years which the legislature may see fit to prescribe? The learned counsel for the relator contend that the power is inherent in the legislature to "regulate, control, and fix the conditions of all contracts between railroad companies and their patrons." They further say:

"It is merely a regulation of the public business, which the legislature has a right to regulate. Its apparent object is to promote the convenience of persons having occasion to travel on the road, and to reduce for them the cost of transportation. Its benefit to the public, who are compelled to patronize railroads, is unquestioned. It

brings the reduction of rates of two cents per mile within the reach of all persons who may have occasion to make only infrequent trips."

No authority is cited which sustains so unlimited a power. If it be sustained, these companies have no control over their affairs and business except to carry out such contracts for common carriage as the legislature may see fit to prescribe. If the legislature may compel these companies to carry married men, their wives and children, at reduced rates, it may also include their servants and employés upon the same ticket, and also the transportation of their goods at reduced rates. It may require the issuance of these tickets to clubs of two or any greater number. It may fix excursion rates at still lower figures, and prescribe the time for which they may be valid. It may make such contracts valid for any number of years. And, under the relator's contention, the courts must determine in each case whether the requirements are reasonable. Certainly, citizens who have invested their money in these corporations are entitled to some control over their business and affairs. It is difficult to understand what control is left to them if this law be sustained. Under the opinion of the learned circuit judge who heard the case, he should have denied the writ. His opinion is against the judgment rendered. He used the following language:

"Upon the other question I care only to remark that this particular provision of the statute, the aid of which is invoked in this case, if constitutional, would seem almost to extend the police power of this State to the practical management of the business of the railway companies, and leave no line beyond which it could be said the State cannot assume to control what are practically the private business affairs of the corporation. And it certainly will not be contended in the present condition of the law that there are not elements of the business affairs of railroad companies with which the State has no more right to interfere than with those of private individuals. The State has assumed to exercise its police power over railroad companies upon the theory of protec-

tion to the public from injuries which might arise from improper construction of its road or rolling stock, or from faulty operation of them. Thus, it assumes to control the construction of its engines and cars, so far as the question of the safety of persons using them may require, the operation of its trains, so far as it is necessary to protect persons on them and those who may rightfully be upon its tracks, the grade at which they may cross one another, with the same idea in view, and, as well, the maximum rate of fare, so far as necessary to protect the public from extortion; but mere questions of expediency have not been considered the subject of legislative control. Considerations of this nature would tend to lead me to the conclusion that this-law ought not to be sustained, did I feel myself free to pass upon such a question."

It was, in my opinion, the clear duty of the circuit judge to enter judgment in accordance with his convictions.

The Constitution grants the legislature the right to fix a reasonable maximum rate. This excludes the power to fix any other rate. It affords the public ample protection against exorbitant and unjust charges. An affirmative grant of power often, though not always, implies an exclusion of other supervision upon the same subject. Mr. Story says:

"The truth is that, in order to ascertain how far an affirmative or negative provision excludes or implies others, we must look to the nature of the provision, the subject-matter, the object, and the scope of the instrument. These, and these only, can properly determine the rule of construction. There can be no doubt that an affirmative grant of powers in many cases will imply an exclusion of all others." 1 Story, Const. § 448.

Does not the express power to fix a maximum rate exclude the power to fix a minimum or any other rate? If this same act had fixed a minimum of two cents per mile, and prohibited the carriage of passengers at a less rate, would counsel contend for the existence of these powers? The result of such a provision would be to prevent railroads from giving cheap excursions, now so common, and

which accommodate and benefit the people. The object of this constitutional provision is to prevent the imposition of extortionate or unreasonable charges, and to secure to the traveling public a just and reasonable charge, one which would give a reasonable return to investors, and a fair and reasonable rate to the public. The legislature performed this function by fixing 2, 2½, and 3 cents per mile as just and reasonable maximum rates. The public are thereby protected. Why should not all contracts within that rate be left to the railroad companies? Is not that a reasonable construction to be placed upon this clause of the Constitution? If these companies choose to accommodate the public by offering reduced rates, by mileage, coupon, club, or excursion tickets, is not that within the reasonable maximum rate fixed, and a proper matter for their own control? I can find no reason or excuse for holding otherwise.

If, however, I am wrong in the conclusion that this express power inhibits the exercise of any other upon the same subject, I am still of the opinion that the act cannot be sustained under the police power inherent in the legislature under the Constitution. The legislature does not possess all the powers not inhibited by the Constitution, and, when one seeks to defend its acts under the police power, he must be able to show that the act is for the protection of the lives, persons, property, or rights of citizens, or necessary to the safety and good order of society. The police power inherent in the legislature is not broad enough to cover every legislative interference with property or personal rights, upon the ground that there is no express inhibition of the power to be found in the Constitution. Every person has the inalienable right to the possession, use, and control of his property and business, so long as he observes the common-law maxim, "*Sic utere tuo ut alienum non lœdas.*" The legislature may authorize municipalities to determine of what material the merchant or manufacturer shall construct his buildings within the city limits, to see that they

1897]    SMITH v. LAKE SHORE, ETC., R. CO.    481

are properly built, and that the plumbing, sewerage, etc., are sanitary. These things are essential to protect the health and lives of employés, patrons, and the public generally. The general public is interested, and hence the legislative interference with what are otherwise the natural rights of individuals is essential and necessary for the good of all. But if the legislature should attempt to fix the size of the building, the dimensions of its rooms, the price of merchandise to be bought and sold, when he should open or close his store or factory, and the terms of contracts he should make, the courts would not hesitate to declare such acts unconstitutional, notwithstanding no express inhibition can be found in the Constitution. The common law secured these rights to the citizens, because their exercise created no injury to others, and was of no concern to the public. They were within the maxim above quoted. When the Constitution was adopted, these common-law rights were preserved, and it was unnecessary to declare in the Constitution that they remained sacred and intact, and that the legislature could not interfere with them. The Constitution was adopted with reference to these existing rights, and impliedly inhibits the legislature from infringing upon them. Among these inherent rights of the citizen is the power to conduct his own business, and to make such contracts as he pleases. This right is the same whether the citizen be a natural or an artificial person. Only when the general public are concerned, for their own safety and protection, may the people, through the legislature, protect themselves against exorbitant charges or the conduct of business in a manner injurious to the public.

The Constitution is entirely silent upon the subject of contempts; yet it is held that the legislature cannot take away this power from the courts, which has from the earliest time been inherent in them. *In re Chadwick,* 109 Mich. 588. We there said: "The Constitution leaves this power existing in the court, as it was at the common law." So the Constitution leaves to the citizen the con-

trol of his property and business, subject to the rules of the common law. "Constitutions are to be construed in the light of the common law, and of the fact that its rules are still in force." 3 Am. & Eng. Enc. Law, 679. Justice COOLEY states the rule thus: "The limit to ·the exercise of the police power in these cases must be this: The regulations must have reference to the comfort, safety, or welfare of society." Cooley, Const. Lim. (6th Ed.) 710. Black says it includes "all such regulations as may be necessary for the safety and good order of society," and adds: "It is evident that the term 'police power' is a very flexible and comprehensive expression, and difficult of exact definition. But it must not be extended beyond its necessary and proper limits. When the police power has fulfilled the essential objects of its reservation to the State, it has also reached the boundaries of its legitimate exercise." Black, Const. Prohib. §§ 61, 62. Has it not fulfilled "the essential object" in this case by fixing a maximum rate? No claim is made that this maximum rate is not a sufficient protection to the public. Upon what principle of law or justice, then, can this power be invoked by the State to control contracts between its citizens which do not injuriously affect the public or any member thereof? If this legislation cannot be upheld under the police power (and, as already shown, this is virtually conceded), it logically follows, if it be sustained, that the legislature is vested with unlimited power to regulate and control the management of these corporations, solely because the Constitution does not in express terms prohibit. This is a doctrine which, in my judgment, finds no support in authority or reason. Whether railroad companies should issue the tickets in question is a matter of little importance, but the establishment of a rule of control is of great importance. All roads issue 1,000-mile tickets. Some issue these family tickets, and some issue 1,000-mile tickets upon which any number of passengers may ride. When the police power is set aside, the door is open to the legislature to prescribe contracts of

all kinds. This is well stated in the opinion of the circuit judge. A somewhat extended discussion of the question is therefore appropriate.

The general rule is not questioned that "the authority of courts of justice to declare void any legislative enactment must be found in express constitutional provisions, limiting legislative power." Text writers and courts have recognized that this rule has its exceptions, and that there are implied as well as express inhibitions. The learned author, Justice COOLEY, after stating the general rule, says:

"It does not follow, however, that in every case the courts, before they can set aside a law as invalid, must be able to find in the constitution some specific inhibition which has been disregarded, or some express command which has been disobeyed. * * * The maxims of *Magna Charta* and the common law are the interpreters of constitutional grants of power, and those acts which by those maxims the several departments of government are forbidden to do cannot be considered within any grant or apportionment of power which the people in general terms have made to those departments." Cooley, Const. Lim. (6th Ed.) 206, 208.

In the early case of *Calder* v. *Bull,* 3 Dall. 386, the Supreme Court of the United States, speaking by Mr. Justice Chase, said:

"I cannot subscribe to the omnipotence of a State legislature, or that it is absolute and without control, although its authority should not be expressly restrained by the constitution or fundamental law of the State. The people of the United States erected their constitutions or forms of government to establish justice, to promote the general welfare, to secure the blessings of liberty, and to protect their persons and property from violence. The purposes for which men enter into society will determine the nature and terms of the social compact; and, as they are the foundation of the legislative power, they will decide what are the proper objects of it. The nature and ends of legislative power will limit the exercise of it. This fundamental principle flows from the very nature of our free republican governments: That no man should be compelled to do what the laws do not require, nor to refrain

from acts which the laws permit. There are acts which the Federal or State legislature cannot do without exceeding their authority. There are certain vital principles in our free republican governments which will determine and overrule an apparent and flagrant abuse of legislative power, as to authorize manifest injustice by positive law, or to take away that security for personal liberty or private property for the protection whereof the government was established. An act of the legislature (for I cannot call it a law) contrary to the great first principles of the social compact cannot be considered a rightful exercise of legislative authority. The obligation of a law in governments established on express compact and on republican principles must be determined by the nature of the power on which it is founded. A few instances will suffice to explain what I mean: A law that punished a citizen for an innocent action, or, in other words, for an act which, when done, was in violation of no existing law; a law that destroys or impairs the lawful private contracts of citizens; a law that makes a man a judge in his own cause; or a law that takes property from A., and gives it to B. It is against all reason and justice for a people to intrust a legislature with such powers; and, therefore, it cannot be presumed that they have done it. The genius, the nature, and the spirit of our State governments amount to a prohibition of such acts of legislation, and the general principles of law and reason forbid them. The legislature may enjoin, permit, forbid, and punish; they may declare new crimes, and establish rules of conduct for all its citizens in future cases; they may command what is right, and prohibit what is wrong; but they cannot change innocence into guilt, or punish innocence as a crime, or violate the right of an antecedent lawful private contract, or *the right of private property.* To maintain that our Federal or State legislature possesses such powers, if they had not been expressly restrained, would, in my opinion, be a political heresy, altogether inadmissible in our free republican governments."

In *Durkee* v. *City of Janesville*, 28 Wis. 467 (9 Am. Rep. 500), in discussing the power of the legislature to exempt the city of Janesville from the payment of costs in tax cases brought against the city when the city was defeated, the court said that they "care very little whether it is placed on those fundamental principles of law and justice

which, in our form of government, it has been held no legislative body can override, even though not prohibited by the written constitution, or upon the provisions of the constitution itself, some of which clearly forbid the enactment of such laws." These two cases were cited with approval in a unanimous opinion by this court. *Wilder* v. *Railway Co.*, 70 Mich. 382. See, also, *Park* v. *Free. Press Co.*, 72 Mich. 560 (16 Am. St. Rep. 544).

In the noted and leading case in this State of *People* v. *Salem*, 20 Mich. 452 (4 Am. Rep. 400), it was vigorously urged by two eminent lawyers that the power of the legislature to authorize municipalities to pledge their credit for the construction of railroads was not expressly inhibited by the Constitution, and therefore must be held to exist. The court took the opposite view, and in the majority opinion, written by Justice COOLEY, said:

"There are certain limitations upon this power not prescribed in express terms by any constitutional provision, but inherent in the subject itself, which attend its exercise under all circumstances, and which are as inflexible and absolute in their restraints as if directly imposed in the most positive form of words." 20 Mich. 473.

It may be proper here to remark that that case held that—

"Railroads are no longer public works, but private property. Individuals, and not the State, own and control them for their own profit. The public may reap many and large benefits from them, and, indeed, are expected to do so, but only incidentally, and only as they may reap similar benefits from other modes of investing private capital." 20 Mich. 485.

See, also, page 489 of the same case.

Justice CHRISTIANCY, a learned jurist, said in *People* v. *Jackson, etc., Plank-Road Co.*, 9 Mich. 307:

"Powers the exercise of which can only be justified on this specific ground [the police power], and which would otherwise be clearly prohibited by the Constitution, can be such only as are so clearly necessary to the safety, comfort, or well-being of society, or so imperatively re-

quired by the public necessity, as to lead to the rational and satisfactory conclusion that the framers of the Constitution could not, as men of ordinary prudence and foresight, have intended to prohibit their exercise in the particular case, notwithstanding the language of the prohibition would otherwise include it."

Now, let us apply to the present case the rule given by Justice COOLEY, that "the regulation must have reference to the comfort, safety, or welfare of society." Certainly, it does not affect or promote the comfort or safety of society, or any member of it. The learned counsel say: "Its apparent object is to promote the convenience of persons having occasion to travel." In what way does it promote this convenience? It can promote the relator's convenience only by permitting him to buy one ticket instead of two or more. This is too trifling a convenience to deserve consideration. I am not aware of any decision holding that mere convenience is a test for the exercise of the police power, but, if it were, the law would not regard the purchase of one ticket instead of two or more a public convenience. Counsel further say: "It brings the reduction of rates of two cents per mile within the reach of all persons who may have occasion to make only *infrequent* trips." Do those "who have occasion to make only infrequent trips" constitute the general public? The provision is not for the benefit or convenience of those who travel on business, for it is the universal custom of railroads to issue 1,000-mile tickets to individuals. Obviously, it will not benefit the great mass of the people, few of whom would expend $20 or $25 at one time on a ticket. The sole benefit is a pecuniary one to the rich and well to do, who would purchase such tickets for visiting or pleasure. Counsel do not appear to seriously claim that the requirement comes within the rule above stated, but rest their contention upon the broad proposition that the legislature may absolutely control the management of railroad corporations, because they are engaged in a public business; that is, a business in which the general public are interested. The argument that

this requirement of the statute is essential to "the comfort, safety, or welfare of society" refutes itself, and cannot be sustained upon the principle of inherent police power.

The argument of counsel logically leads to the conclusion that the legislature may manage and control the business of the railroads of this State just as fully and completely as it could if the State owned them. The State did once own three railroads, of which the respondent was one, and managed them. It did not make a success of the business, and sold them to private parties. Is it possible to hold that the State, by implication, reserved the exclusive right to manage, direct, and control them, and determine what contracts they should make, and then that the courts should determine whether they were reasonable? No such reservation is found in the articles of sale or in any law of the State under which other roads have been constructed. Upon what principle can courts read such reservation into the law? Neither legislatures nor judges are experienced in the business of running railroads. Why should the former be authorized to make contracts for them, and the latter to determine their reasonableness, when such contracts have no "reference to the comfort, safety, or welfare of society?" The property of railroads is private property. Neither the State nor the public has a penny invested in them. Private capital has contributed every dollar to their construction and equipment. Their owners have built them for private profit, and not as public benefactors; otherwise, the *Salem Case* was wrongly decided. Railroad companies are common carriers, pure and simple. They are not public corporations in the sense that municipal corporations are public. They are termed "*quasi* public corporations" only because the general public may deal with them, are entitled to have themselves and their goods carried by them, and they are therefore subject to those regulations which are necessary for the protection of the

public. This proposition is well stated in the opinion of the learned circuit judge above quoted.

The mere fact that the Constitution and the statute have given these common carriers the power to obtain a right of way over private property by agreement or condemnation does not confer upon the legislature the power to control their management, as if they were the sole property of the State. Individuals, in their natural capacity, may build a railroad over their own lands, and over the lands of others, where, by agreement, they obtain the right of way, and may hold themselves out to the public as common carriers of freight and passengers. The public would have the same right in such a common carrier as they would have in a corporate common carrier organized under the general law of the State. The fact that a right of way may be condemned for the benefit of the common carrier, as well as for the public, cannot logically be held to make such common carrier a strictly public corporation, over which the legislature has the same control as it has over municipal corporations or over its own property. Article 15 of the Constitution treats of corporations. Section 9 authorizes corporations, other than municipal, to take private property for public use; that is, a use in which the public have a public interest, and in which the private corporation has a private interest. Section 15 authorizes municipalities to take private property for public improvements. Section 14 of article 18 authorizes the taking of land for private roads. We need not discuss to what extent these provisions involve the exercise of the power of eminent domain. "Eminent domain is the right or power of a sovereign State to appropriate private property to particular uses, for the purpose of promoting the general welfare." Lewis, Em. Dom. § 1; 6 Am. & Eng. Enc. Law, 511. In its original and strict sense, it implies that the State takes the land, and compensates the private person for his damages. Grotius wrote: "When this is done, the State is bound to make good the loss to those who lose their property." It is now universally

held that this right may be delegated to private parties, corporate or individual. But I submit that such delegation to private parties does not take away from them all their common-law rights, and vest them in the State, subject to the judgment of courts as to the reasonableness of the control exercised by the State.

It follows that the inherent power in the legislature to fix rates of carriage by railroads is based upon precisely the same principle as is the power to fix the rates to be charged by all common carriers, such as hackmen, ferrymen, and other carriers of persons and of freight. No one would contend that the legislature could require hackmen or ferrymen or owners of omnibuses to enter into contracts with their patrons to carry them for two years at a rate below the amount otherwise fixed by law, or that they should carry married men and their families at reduced rates. The legislature of Illinois passed a law fixing a maximum charge for elevating and storing grain. The law was attacked as unconstitutional, but was sustained by the Supreme Court of the United States, upon the ground that the public had an interest in the business, and it was therefore subject to the control of the legislature so far as fixing the rates was concerned, thereby protecting the public from exorbitant charges. *Munn* v. *Illinois*, 94 U. S. 113. The same principle is the basis for the exercise of the police power in regard to railroads, elevators, hacks, ferries, etc. If the legislature does not possess the power in the one case to compel the party, whether natural or artificial, to enter into contracts for the future, neither does it in the other. The subject is so fully and exhaustively treated in both the majority and minority opinions in that case that I will not discuss it further; but, for the purpose of showing the basis upon which courts have sustained the legislative power to fix maximum rates, I quote the following from the majority opinion:

"When one becomes a member of society, he necessarily parts with some rights or privileges which, as an

individual not affected by his relations to others, he might retain. 'A body politic,' as aptly defined in the preamble of the constitution of Massachusetts, 'is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good.' This does not confer power upon the whole people to control rights which are purely and exclusively private (*Thorpe* v. *Railroad Co.*, 27 Vt. 143); but it does authorize the establishment of laws requiring each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another. This is the very essence of government, and has found expression in the maxim, '*Sic utere tuo ut alienum non lœdas.*' From this source came the police powers, which, as was said by Mr. Chief Justice Taney in the *License Cases*, 5 How. 583, 'are nothing more nor less than the powers of government inherent in every sovereignty; * * * that is to say, * * * the power to govern men and things.' Under these powers, the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good. In their exercise, it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, etc., and, in so doing, to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold."

The opinion cites *Allnutt* v. *Inglis*, 12 East, 527, in which was involved the right to charge arbitrary rates for storage, and quotes from the opinion in that case as follows:

"But, though this be private property, yet the principle laid down by Lord Hale attaches upon it,—that, when private property is affected with a public interest, it ceases to be *juris privati* only; and, in case of its dedication to such a purpose as this, the owners cannot take arbitrary and excessive duties, but the duties must be reasonable."

The act, moreover, seriously interferes with the power of subsequent legislatures to change and increase the maximum rate should the financial condition of the rail-

road companies appear to demand it.    Thousands of con-
tracts would undoubtedly have been made which would
run two years after the act of a subsequent legislature in-
creasing the rate.    It is furthermore obvious that parties
acting upon the probability of a repeal of the previous
law, and the enactment of another increasing the rate,
would purchase tickets by the thousand.    The legislature
could not annul the contracts made under the prior law.
A contract valid when made is valid till executed, and the
legislature could not annul it.    If they make these con-
tracts to extend over two years, I see no reason why they
may not be made to extend over four, eight, or ten, nor
do I see any grounds upon which courts could hold them
unreasonable.    It can make no difference whether a con-
tract is entered into voluntarily or by a provision of
the law.    They are equally valid and binding.    The
State cannot direct that to be done which it could not
do itself were it engaged in the business.    If this rail-
road were owned by the State, as it once was, and
the State should make such contracts extending over
two or more years, it would be held to the fulfillment
of its contracts, even if it were dishonest enough to
attempt to repudiate them.    It is immaterial that some
railroad companies have issued tickets of the kind pro-
vided by this act, or that the respondent has issued 1,000-
mile tickets to single individuals.    The power of the leg-
islature is not to be tested by the voluntary acts of the
parties over whom control is sought to be exercised.    Be-
cause common carriers have made contracts with their
patrons, the legislature is not therefore authorized or jus-
tified in enacting that such contracts shall be made.    The
same rules of construction must apply as would be applied
if 1,000-mile tickets had never been issued, and the legis-
lature were attempting for the first time to compel their
issuance.    If the legislature possessed the power to so
enact, subject to reasonableness, the fact that such con-
tracts had been voluntarily made would be evidence of
the reasonableness of the law compelling them, but is of

no force whatever in determining whether the power exists. Probably, all railroad companies have issued excursion tickets at less than a cent a mile, and valid for a few days. Does this fact authorize the legislature to enact that such companies *must* give these excursions, and to determine how often, at what rate, and the time within which the tickets shall be good for passage? Is this within the constitutional power of the legislature, either express or implied, to protect the public from extortion by fixing reasonable maximum rates?

The opinion of the court should be affirmed, but its judgment was erroneous, and should be reversed, and the petition dismissed, with the costs of both courts.

HOOKER, J. I concur in the conclusion reached by my Brother GRANT. Our Constitution, as amended in 1870, provides that—

"The legislature may, from time to time, pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on different railroads in this State, and shall prohibit running contracts between such railroad companies whereby discrimination is made in favor of either of such companies as against other companies owning connecting or intersecting lines of railroad." Const. art. 19a, § 1.

Acting upon this authority, the legislature fixed a maximum rate per mile for the transportation of passengers which the railroads might charge. The first attempt to do more was by an act which recognized the short haul, and allowed a higher rate per mile for short distances than for long. It is now proposed by the act under consideration to discriminate in favor of the passenger who shall purchase transportation in large quantities, by giving him a lower rate, and to give special advantages to men of family. Will the next step be a law requiring the sale of transportation for freight at a reduced rate to large shippers? Without discussing the propriety of discrimination by the railroad companies, based upon competition and common business principles, we may well doubt the

validity of legislation requiring it. The interstate commerce act seems to have been designed to prevent the very thing that this law requires. I have doubts of the constitutionality of legislation which does more than to assure to any person the right of carriage upon payment of the ordinary lawful fare.

Under the Constitution, our legislature may fix a maximum rate, and, while the question of discrimination growing out of the long and short haul was not discussed, the validity of such legislation may be settled by the *Wellman Case*, 143 U. S. 339. I am of the opinion, however, that the legislature has no power to say that a ticket shall be sold to one man cheaper than to another, or that it shall have a broader effect, and therefore a greater value, to one than to another, depending upon a willingness to purchase the right to transportation in large quantities, or upon the fact that the purchaser has a family. It might as well be made to depend upon his age, occupation, poverty, or necessity, as upon his ability to purchase in quantities, or to have and support a family.

Again, the word "maximum" cannot be ignored. It has some use in the constitutional provision. To my mind it excludes the power of discriminatory legislation, leaving it to the railroad companies to make lawful concessions to their patrons as their business interests may require or permit.