## PINGREE v. MICHIGAN CENTRAL RAILROAD CO.

1. RAILROAD COMPANIES — TRANSPORTATION CHARGES — LEGISLATIVE CONTROL.

   The legislature has the power, within certain limits, to regulate the rates to be charged by railroad companies for transportation.[1]

2. SAME—CHARTER—IMPAIRMENT OF CONTRACT.

   But the power to fix rates within a prescribed maximum may be so directly conferred upon a company by its charter as to render interference by subsequent legislatures an impairment of the obligation of a contract.

3. SAME—MICHIGAN CENTRAL CHARTER—CONSTRUCTION.

   Section 15 of the Michigan Central charter (Act No. 42, Laws 1846) provides that it shall be lawful for the company, from time to time, to fix, regulate, and receive the tolls and charges to be taken for the transportation of property and persons on

---

[1] The power of the legislature to fix tolls, rates, and prices is the subject of an extensive note to *Winchester, etc., Turnpike Road Co. v. Croxton*, (Ky.) 33 L. R. A. 177.

its road, *subject only* to a limitation as to passengers of three cents a mile, and ten cents in addition on distances not exceeding thirty miles. But section 11 contains the provision that "the said company shall have power to charge for tolls and transportation such sums as shall be *lawfully* established by the by-laws of said company;" and section 30 confers upon the board of directors the power to pass all by-laws necessary to carry into execution the powers vested in the company: "*Provided,* such by-laws shall not be contrary to the Constitution or laws of the United States or of this State." *Held,* that section 15 confers upon the company the contract right to regulate the rate of charges for the transportation of passengers, within the limit of three cents per mile, and that such right is not qualified by sections 11 and 30.

4. SAME—ENLARGEMENT OF POWERS—DISSOLUTION OF CORPORATION.

In 1846 the Michigan Central Railroad Company became a corporation, with the right under its charter to operate a railroad within the borders of the State, the State reserving an option to repurchase upon specified terms. By Act No. 197, Laws 1848, the legislature authorized the corporation to build and operate a railroad from the southern line of the State to Chicago. *Held,* that, even if the option of the State was impliedly repealed by reason of the later act destroying the basis of fixing the price, such an enlargement of the corporate powers did not operate to dissolve the original corporation, and create a new and different one.

5. SAME.

Act No. 139, Laws 1855, authorizing said company to build a double track, and to sell bonds therefor, and to make business contracts with other railroads, organized or to be organized, for the operation thereof by said company, did not dissolve the corporation, and create a new corporation, subject to the provision of the Constitution of 1850 reserving to the legislature the power to amend, alter, or repeal the charters of all corporations afterwards created.

6. SAME—CONSOLIDATION—STATUTORY AUTHORITY—STRICT COMPLIANCE.

Statutes authorizing the consolidation of railroads must be substantially complied with in order to effect the formation of a new corporation.

7. SAME—INTENT.

Where the enabling act is ambiguous or uncertain, the intent of

the companies may be an important consideration in determining whether a consolidation has been effected in a given case.

8. SAME.

The Michigan Central Company, by availing itself of special statutory authority to make business arrangements with other companies, with a view to operating their roads as branch lines, did not effect a consolidation with such companies, so as to become merged in a new corporation under the terms of the general statute.

9. SAME—FAMILY MILEAGE ACT—AMENDMENT OF CHARTER.

Act No. 90, Pub. Acts 1891, providing for the issuance of family mileage tickets, cannot be deemed an exercise of the power of amendment reserved in the charter of said company, subject to the provision that the company should be compensated for all damages sustained by reason of amendment, as it does not purport to be an amendment of the charter, and contains no provision for compensating the company for the loss of its exclusive right under the charter to fix its fares.

*Certiorari* to Wayne; Donovan, J. Submitted June 18, 1898. Decided October 3, 1898.

*Mandamus* by Hazen S. Pingree to compel the Michigan Central Railroad Company to issue a family mileage book. From an order granting the writ, respondent brings *certiorari*. Reversed.

*Fred A. Maynard*, Attorney General, and *John Atkinson*, for relator.

*Ashley Pond* and *Henry Russel* (*Benton Hanchett* of counsel), for respondent.

HOOKER, J. The circuit court for the county of Wayne granted a *mandamus* to compel the respondent to issue to relator a ticket, popularly known as a "family mileage ticket," described in Act No. 90 of the Public Acts of 1891. This act has been considered in the case of *Smith* v. *Lake Shore & Michigan Southern R. Co.*, 114 Mich. 460, and held applicable to that company, which, like the respondent, was one of the railroad companies

chartered by the legislature previous to the adoption of the Constitution of 1850, which reserves the power of amendment and repeal as to all corporations thereafter created. Many of the questions raised in that case are before us upon this record, but such as are covered by the decision mentioned need not be discussed here.

It is the claim of the railroad company that its original charter constituted a contract between itself and the State, whereby it was given the right to fix the rate to be charged for the transportation of passengers, within the limit of the maximum rate therein prescribed, of three cents a mile, and to regulate the manner of collecting the same; and that these privileges cannot be revoked or altered except upon compliance with the reservation of power to be found in the charter, viz., by compensating the company therefor. The relator contends:

1. That the legislature has the general power to fix rates of transportation by railroads.

2. That it cannot part with this authority, by contract or otherwise, so as to bind succeeding legislatures.

3. That, if such a thing were possible, the charter of the respondent should not be so construed.

4. That, even if the charter had the effect contended for, it has been surrendered, or so altered by its consent, that the respondent is subject to the provisions of the general railroad law and the Constitution of 1850.

5. That, if not lost by surrender, it is lost by virtue of Act No. 90, hereinbefore mentioned, which must be treated as an amendment under the charter, taking away the right to fix tolls, but subject to the right of the company to recover damages from the State in a proper proceeding.

Relator's first proposition, viz., that the legislature has power to fix rates, within certain limits, is not an open question. It has been so held in the cases of *Wellman* v. *Railway Co.*, 83 Mich. 592, and *Smith* v. *Railway Co.*, 114 Mich. 460, where the authorities are cited.

To the assertion that the right to regulate tolls belongs to the police power, and cannot be bartered away, we reply that the almost uniform current of judicial authority

is to the effect that such power may be given to corporations, and that, where the intent to do so is clear, a subsequent attempt by the legislature to fix tolls is the violation of a contract, under the provisions of the Federal Constitution. We will allude to some of the cases which the industry of counsel has collected. In the case of *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, it appeared that the legislature had, in 1875, granted to the gas company the exclusive right for 50 years to supply gas to the city of New Orleans through pipes laid in the public streets. Subsequently, by a new constitution, adopted in 1879, it was provided that the "monopoly features" in the charters of all existing corporations save railroads should be abolished, and in 1881 the light company was authorized to use the streets of New Orleans for the purpose of supplying gas to the public. A bill filed to restrain this project was dismissed by the local court, and the United States Supreme Court reversed the decree. The unanimous opinion of the court, delivered through Mr. Justice Harlan, recognized the right of the State, in the exercise of the police power, to carry on the business of furnishing gas itself, or select one of several agents to do so, but held that "the police power, according to its largest definition, is restricted in its exercise by the National Constitution;" that "this is shown by those cases in which grants of exclusive privileges respecting public highways and bridges over navigable streams have been sustained as contracts, the obligations of which are fully protected against impairment by State enactments." As supporting the proposition, the distinguished jurist cited *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116; *The Binghamton Bridge*, 3 Wall. 51; *West River Bridge Co.* v. *Dix*, 6 How. 507, 531. He approved the language of Chief Justice Martin in *Pontchartrain R. Co.* v. *Orleans Nav. Co.*, 15 La. 404, 413, where he says:

" In the same manner as Congress may reward the discoverer of a new invention or mode of constructing roads by an exclusive privilege, the legislature may reward

those who employ their capital and industry in doubtful enterprises for the construction of a railway between two points, which may be of great utility to the public, though the success of the enterprise may be precarious."

Allusion was also made to cases in which it is held that an exemption from taxation for a valuable consideration, at the time advanced, constitutes a contract within the meaning of the Constitution.

In the case of *Bridge Proprietors* v. *Hoboken Co.*, *supra*, Mr. Justice Miller, in discussing a grant of an exclusive right to erect and maintain a bridge, said that:

"Without this, they would not have invested their money in building the bridges, which were then much needed, and which could not have been built without some such security for a permanent and sufficient return for the capital so expended. On the faith of this enactment they invested the money necessary to erect the bridges. These acts and promises on the one side and the other are wanting in no element necessary to constitute a contract."

The case of *Binghamton Bridge, supra,* involved the question whether a charter to a company, authorizing it to build and maintain a bridge for the accommodation of the public, for which it was given the right to take certain tolls, and providing that it should be unlawful for any one to build a bridge within two miles, constituted a contract within the meaning of the Constitution. The question arose by reason of the erection of another bridge. It was held to be a contract, in the following vigorous language of Mr. Justice Davis:

"If anything is settled by an unbroken chain of decisions in the Federal and State courts, it is that an act of incorporation is a contract between the State and the stockholders. * * * A departure from it now would involve dangers to society that cannot be foreseen, would shock the sense of justice of the country, unhinge its business interests, and weaken, if not destroy, that respect which has always been felt for the judicial department of the government. * * * The purposes to be attained are generally beyond the ability of individual enterprise, and can only be accomplished through the aid of asso-

ciated wealth. This will not be risked, unless privileges are given and securities furnished in an act of incorporation. The wants of the public are often so imperative that a duty is imposed on the government to provide for them; and, as experience has proved that a State should not directly attempt to do this, it is necessary to confer on others the faculty of doing what the sovereign power is unwilling to undertake. The legislature, therefore, says to public-spirited citizens: 'If you will embark, with your time, money, and skill, in an enterprise which will accommodate the public necessities, we will grant to you for a limited period, or in perpetuity, privileges that will justify the expenditure of your money, and the employment of your time and skill.' Such a grant is a contract, with mutual considerations; and justice and good policy alike require that the protection of the law should be assured to it."

Recurring to the case of *New Orleans Gas Co. v. Louisiana Light Co.*, *supra*, where the foregoing authorities are commented upon, we find a distinction clearly drawn between cases where the grants have been claimed to confer privileges injurious to public morals or public health, and those where they compensated persons for performing a public service; and the case elaborates still further the proposition that a State cannot justify the repudiation of its solemn engagements by the claim that the police power cannot be diminished.

The existence of this power on the part of the legislature to bind the State, by a grant of a right to take tolls, is one thing, and the question whether it has been exercised is quite another. We shall find numerous cases where it has been held that the State has not parted with this power, and, we may add, many of these seem to admit that such a contract may be made by apt and clear language showing such intent. The case of *Stone* v. *Railroad Co.*, 62 Miss. 607 (52 Am. Rep. 193), is a case in point. The railroad company was incorporated by an act of the legislature of the State of Mississippi approved February 17, 1882, which contained the following, among other sections:

"Sec. 6. That said company shall have and possess the power of fixing, from time to time, by its board of directors, the rates at which it will do express and telegraph business, and shall transport other express companies as may apply for transportation over its line, at a just and reasonable rate of compensation, and also the rates at which said company will transport persons or property over its railroads and branches: *Provided*, said last-mentioned rates shall not exceed four cents per mile for each passenger, nor exceed the following rates of freight: * * * but in no case shall the railroad company be limited to a less charge than 25 cents for the transportation of any passenger, parcel, package, or article, however short the distance. The rates so established from time to time by the said board of directors for transporting persons or property as a railroad company, not exceeding the maximum rates for railroad business as above set out, may be charged and collected by said company."

Subsequently the legislature provided a commission with power to reduce rates. The court of last resort disposed of the case in a forceful opinion, which fully recognizes the rule that a grant of a right to fix tolls may be a valid contract. It is as follows:

"Section 6 of the charter of the appellee confers on the company power to fix, from time to time, by its board of directors, the rates at which it will transport persons or property over its railroads, provided they shall not exceed a maximum specified in the act.

"The power to contract is an essential attribute of sovereignty, and is of prime importance. Its exercise has been productive of incalculable benefits to society, however great may be the evils incident to its injudicious employment. It cannot be denied merely because of its liability to abuse. The power to contract implies the power to make a valid contract. Chartering railroad companies and other similar associations has long been an acknowledged and a favorite exercise of legislative authority. The right to grant charters includes the right to grant such as will be upheld. * * * A grant in general terms of authority to fix rates is not a renunciation of the right of legislative control so as to secure reasonable rates. Such a grant evinces merely a purpose to confer power to exact compensation which shall be just and reasonable.

It is only where there is an unmistakable manifestation of a purpose to place the unrestricted right in the corporation to determine rates of compensation that the power of the legislature afterwards to interfere can be denied. It is not to be presumed that the right of legislative control was intended to be renounced. Every presumption is against that. If the grant can be interpreted without ascribing to the legislature an intent to part with any power, it will be done. Only what is plainly parted with is gone. Fixing rates in a charter is a specification of what is reasonable,—an exclusion of tacit or implied conditions on the subject. It is an essential part of the contract of incorporation, the most important condition of its existence, the inducing cause of its acceptance.

"That it was the legislative intent to vest in the appellee the unrestricted right to fix rates within the limits prescribed by the charter is clear. That this was a valid contract by the State, and inviolable by it, we regard as settled authoritatively by Federal and State decisions too numerous for citation. If anything is, or ever can be, settled in American constitutional law, the sanctity and inviolability of a contract between a State and individuals, in the shape of a charter for a business enterprise, accepted and acted on by the corporators on the faith of its terms and provisions, must be so regarded. The appellee has the unquestionable right, from time to time, by its board of directors, to fix the rates at which it will transport over its railroads, provided those rates shall not exceed the maximum prescribed by the charter. That is the contract. These terms were expressly made. On the faith of them capital was invested, and the enterprise set on foot. It is not allowable now for one of the contracting parties to interfere with the exercise by the other of its plainly granted rights. They are secured beyond the reach of legislation, and cannot be impaired. The State cannot, by an act of its legislature, abdicate the right to govern artificial as well as natural persons, but it may create corporations, and, where they are not a part of the machinery of government, the franchise cannot be resumed by the legislature, or its benefits be essentially impaired, without the consent of the grantee. To hold otherwise would be revolutionary, and disturb the foundations of society as molded by the judicial utterances of half a century of constitutional government in America."

We think there is no force in the suggestion that this

decision might have been different had the legislature itself fixed the reduced rate, instead of attempting to delegate the authority to a commission.

See, also, *Georgia, etc., Banking Co.* v. *Smith*, 128 U. S. 174, where Mr. Justice Field said:

" It is conceded that a railroad corporation is a private corporation, though its uses are public, and that a contract embodied in terms in its provisions, or necessarily implied by them, is within the constitutional clause prohibiting legislation impairing the obligation of contracts. If the charter in this way provides that the charges which the company may make for its services in the transportation of persons and property shall be subject only to its own control up to the limit designated, exemption from legislative interference within that limit will be maintained."

In the case of *Reagan* v. *Trust Co.*, 154 U. S. 362, Mr. Justice Brewer said:

"If the charter had in terms granted to the corporation power to charge and collect a definite sum per mile for the transportation of persons or property, it would not be doubted that the express stipulation formed a part of the obligation of the State, which it could not repudiate."

In the case of *Chicago, etc., R. Co.* v. *Iowa*, 94 U. S. 155, Chief Justice Waite used similar language. He said:

" It was within the power of the company to call upon the legislature to fix permanently this limit, and make it a part of the charter, and, if it was refused, to abstain from building the road and establishing the contemplated business. If that had been done, the charter might have presented a contract against future legislative interference; but it was not, and the company invested its capital relying upon the good faith of the people and the wisdom and impartiality of legislators for protection against wrong under the form of legislative regulation."

Again, in *Peik* v. *Railway Co.*, 94 U. S. 164, he said:

"In *Munn* v. *Illinois*, 94 U. S. 113, and *Chicago, etc., R. Co.* v. *Iowa*, Id. 155, we decided that the State may limit the amount of charges by railroad companies for fares and freights, unless restrained by some contract in

the charter, even though their income may have been pledged as security for the payment of obligations incurred upon the faith of the charter.   So far this case is disposed of by those decisions."

The same power is recognized in the case of *Ruggles* v. *Illinois*, 108 U. S. 526.

The case of *State* v. *Maine Cent. R. Co.*, 66 Me. 488, supports the doctrine that a valid contract may be made, though restrictive upon the subsequent exercise of the police power,—citing numerous authorities; and we may conclude the discussion of this subject as we commenced it, by saying that, as we understand the authorities, they are practically uniform upon the main proposition.

Having reached the conclusion that the State had power to make a valid contract with the respondent, whereby it was authorized to fix rates, we will next examine the charter, to ascertain whether its language should be so construed.   The history of this charter is familiar.   The State had entered upon a policy of internal improvement, which, at the time this charter was granted, had been found impolitic and disastrous, and the Constitution adopted soon after reflected public sentiment by prohibiting the State from engaging in any work of internal improvement except by grant of property.   It had commenced to build lines of railroad across the State. The public documents of the day, such as gubernatorial messages and legislative papers, clearly indicate that negotiations were had for the sale of the Central road, in which the price to be paid and the privileges to be accorded were carefully weighed.   In his message to the legislature Gov. Felch said:

"Much complaint has existed of the high charges for freight on these roads; yet, even at these rates, it is very doubtful whether anything has been received from this branch of their business above the expenses of transportation and the actual injury to the roads and their stock and fixtures.   *   *   *   It would seem that true policy requires that the Central road should be speedily rebuilt with T. or H. rail.   *   *   *   No direct proposition for

the purchase of these works, or either of them, has yet been made, but it is understood that there are those who are ready to negotiate for the purchase, if it can be made on terms sufficiently favorable. The granting of an act of incorporation to the purchasers seems to be deemed indispensable. The reluctance of many of our citizens to see these important works fall into the hands of corporate bodies has occasioned some opposition to the proposed sale, and it must be admitted that this objection is not without weight. If the legislature should entertain the proposition favorably, it will, of course, be in their power to annex to the corporation such guards and restrictions as shall best secure the public interests. A maximum rate of tolls may be established in the charter. The company may be required to finish the road in the best possible manner, and in such time as the legislature may designate, and to keep it in the best possible repair and in constant operation. The right of repurchase after a certain period and on certain conditions may, if deemed advisable, be retained by the State, and a simple method in case of forfeiture of the chartered privileges may be adopted for annulling the charter and revesting the property in the State. But, while every requisite guard should be thrown around such chartered rights, it should be remembered that the facilities granted in such charter will be regarded as of the utmost importance by those proposing to purchase, and the character of the provisions may very possibly determine the question whether or not a sale can be effected. The utmost discretion is therefore necessary in so framing the provisions of such a charter as to protect as fully as possible the public weal on the one hand, and not to defeat the possibility of a sale by unusual restrictions and impracticable requirements on the other." Joint Documents 1846, Introduction, pp. 27, 28.

The legislative records show the following:

"The select committee to whom was referred so much of the message of the governor as relates to the sale of the works of internal improvement, and to whom have been also referred great numbers of petitions very numerously signed, and coming from almost every portion of the State, praying for the sale of the public works, beg leave to report: * * * It is without precedent that any company has brought to the West such an amount of money to be invested in any enterprise. In looking

through the length of the land, your committee find but one district of country in which capital to that amount can be well spared for investment at a distance, and but one class of men in that district whose vigilant and far-seeing eye would be likely to engage them in such an adventure. The men named in the bill presented are of that class. Of their ability to take and complete the road no doubt is entertained, and your committee have strong grounds to believe that they will purchase the road on the terms proposed, if the bill shall become a law in its present shape; but, in case any material alteration is made, they cannot anticipate with any confidence such a result.    *    *    * To protect the people against unreasonable charges for freight and passengers, the maximum for passengers within the State is three cents per mile, and upon the great staples of produce and consumption, flour, grain, lime, plaster, salt,    *    *    *    the tolls are limited to the average of tolls on the best New England roads upon the same articles; these rates to be reviewed and adjusted once in ten years, if the State desires it." House Documents 1846, Doc. No. 2.

"That the Central and Southern roads present sufficient inducements to capitalists to make a purchase desirable seems to be generally conceded, but the sum of money they will bring cannot, of course, be ascertained until terms of sale are proposed and an offer made.    *    *    * Again, the amount of money which a company would be willing to pay would be increased or diminished by the extent of the privileges and corporate powers which the legislature might see fit to grant.   Unusual restrictions or reservations would either prevent a sale altogether, or lessen very materially the price which the purchaser might otherwise be willing to give.   The policy of the legislature in this respect should be, in the opinion of your committee, to grant a charter delegating liberal powers and privileges, but so defined and guarded as to keep the companies in proper check and prevent abuse.   On such terms a sale could probably be effected, while it might be impracticable to sell should greater restrictions be imposed.   Capitalists will not invest their money where the rights to be acquired are ill-defined, or where they can be interfered with, or taken away, at the option of a legislature."   Senate Documents 1846, Doc. No. 9.

It would seem obvious that the granting of a right to fix tolls within a limit prescribed was intended.

The first section of the act (Act No. 42, Laws 1846) created the corporation. The second provided for the purchase of the road and property pertaining thereto for the sum of $2,000,000. Section 3 provided for a forfeiture and dispossession in case of a failure to meet the payments as agreed upon. Section 12 provided:

"The said company * * * shall have power to regulate the time and manner in which goods and passengers shall be transported, taken, and carried on said railroad, as well as the manner of collecting all tolls and dues on account of transportation, carriage, and storage."

Section 15 provided that it should be lawful for said company, from time to time, to fix, regulate, and receive the tolls and charges taken for the transportation of property and persons on said railroad, subject only to a limitation as to passengers of three cents a mile, and ten cents in addition on distances not exceeding thirty miles.

The following provisions of sections 36 and 39 may be mentioned in this connection:

1. The State reserves the right, at any time after January 1, 1867, to purchase said railroad, and all the property, effects, and assets of the company, upon terms named, based upon the market value of the property at the time of such purchase.

2. The rights and franchises vested or which may vest in the company under or by virtue of said act "shall not in any manner be prejudiced or affected save as herein provided, or by judicial proceedings, or by a repurchase of said railroad, to be made by the State" as in said section (36) provided.

"3. The State reserves the right, at any time after thirty years from the passage of this act, by a vote of two-thirds of each branch of the legislature, to alter, amend, or repeal the same: *Provided*, that said company shall be compensated by the State for all damages sustained by reason of such alteration, amendment, or repeal."

Section 15 makes it lawful for the company to use its own judgment in fixing tolls, and provides that it shall not receive more than three cents per mile for the transportation of passengers, and imposes a penalty for charging

more. In the case of *Georgia, etc., Banking Co.* v. *Smith*, 128 U. S. 174, a charter containing the following provision was before the court:

"The said Georgia Railroad Company shall, at all times, have the exclusive right of transportation or conveyance of persons, merchandise, and produce over the railroad and railroads to be by them constructed, while they see fit to exercise the exclusive right: *Provided,* that the charge of transportation or conveyance shall not exceed fifty cents per hundred pounds on heavy articles, and ten cents per cubic foot on articles of measurement, for every one hundred miles, and five cents per mile for every passenger."

At first blush this might seem to authorize the fixing of rates within the limit of five cents a mile. But the court held otherwise. It will be noticed that the provision there construed gave to the railroad an exclusive use of the road, which theretofore was supposed to be open to use by others, upon the proviso that the charge for transportation should not exceed five cents. So long as this price was not exceeded, the right would continue exclusive; but it did not follow that a contract right to fix tolls up to five cents was conferred. The section contained no express grant of power, and none is necessarily implied. Such was the construction of the court, but it was careful to say:

" If the charter in this way provides that the charges which the company may make for its services in the transportation of persons and property shall be subject only to its own control up to the limit designated, exemption from legislative interference within that limit will be maintained."

Again, there is a class of cases where charter provisions give the right to fix rates in general terms. That is no more than the common carrier would have by implication were the charter silent upon the subject of compensation. In *Stone* v. *Trust Co.*, 116 U. S. 307, the charter under consideration granted to the company the right, "from time to time, to fix tolls and charges." It prescribed no limit. The court held that, in the absence of words of

positive grant, or their equivalent in the law, the power of the State to regulate would not be cut off, and that reasonable doubts should be resolved in favor of the State; citing the words of Mr. Chief Justice Marshall in *Providence Bank* v. *Billings*, 4 Pet. 514, 561, that "its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear;" citing, also, *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420; *Minot* v. *Railroad Co.*, 18 Wall. 206; *Bailey* v. *Magwire*, 22 Wall. 215; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659; *Newton* v. *Commissioners*, 100 U. S. 548. Referring to the provision of the charter, the court said:

"We find, first, the authority given to carry persons and property. This of itself implies authority to charge a reasonable sum for the carriage. In this way the corporation was put in the same position a natural person would occupy if engaged in the same or like business. Its rights and privileges in the business of transportation are just what those of a natural person would be under like circumstances; no more, no less. The natural person would be subject to legislative control as to the amount of his charges; so must the corporation be."

In short, the provision that it might, from time to time, fix tolls, was a grant of nothing that it would not have had the right to do had it not been inserted, and did not have the effect of enlarging its rights, as no intention to do so was apparent.

In *Stone* v. *Illinois Cent. R. Co.*, 116 U. S. 347, the charter granted power "to establish such rates for transportation as they may deem proper, and to alter and change them at pleasure;" and it was held that it did not show an intent on the part of the legislature to part with the power to regulate. The provision was substantially the same as that in *Stone* v. *Trust Co.*, *supra*. The other railroad commission case— *Stone* v. *New Orleans, etc., R. Co.*, 116 U. S. 352 — needs no discussion further than to say that the charter there discussed expressly reserved to the legislature the power to regulate rates.

The charter of the respondent contains a direct grant of power to fix, regulate, and receive tolls. It also fixes what it evidently considered a reasonable rate as to passengers, viz., three cents per mile. It clinches the matter by providing that the respondent's right to fix tolls should be limited by this rate of three cents, and by that *only*. It was not, then, a general grant of power, and therefore limited to fixing rates the reasonableness of which should be determined by the usual methods, and consequently the same power as any individual or corporation would have without it, but was intended to confer a contract right to fix tolls, within the limit of three cents a mile, as plainly as though it had provided that said road should have the right to charge three cents a mile, or less, in its discretion, for transportation of passengers. It will be noticed in the cases cited that in no case where a maximum rate was fixed has the right of the company to fix tolls to that amount been denied. This case is even stronger than such, inasmuch as the charter expressly fixes the limitation, and unqualifiedly states that such shall be the *only limitation* of the company's power.

But our attention is called to the provisions of sections 11 and 30, which are said to limit the power conferred by section 15. Section 11 contains the provision that "the said company shall have power to charge for tolls and transportation such sums as shall be lawfully established by the by-laws of said company." Section 30 confers upon the board of directors the power to do many acts, and concludes as follows: "And shall have power to pass all by-laws which may be necessary for the carrying into execution all the powers vested in the company hereby incorporated: *Provided*, such by-laws shall not be contrary to the Constitution or laws of the United States or of this State." It is contended that these provisions negative any contract right, to the exclusion of regulation of rates by the legislature, that otherwise might be conferred by section 15, and we are cited to *Ruggles* v. *Illinois*, 108 U. S. 526, in support of the contention. The charter

provisions in that case conferred only a general power to fix rates, and we have already shown that such provisions do not confer a right to do more than fix reasonable rates within the limits that the legislature may, from time to time, prescribe.     The provision was as follows:

"Shall have power to make, ordain, and establish all such by-laws, rules, and regulations as may be deemed expedient and necessary to fulfill the purposes and carry into effect the provisions of this act, and for the well ordering, regulating, and securing the affairs, business, and interest of the company:     *Provided*, that the same be not repugnant to the Constitution and laws of the United States, or of this State, or repugnant to this act."

The court, after quoting the above provision, which was a part of an amending section (section 6), proceeds as follows:

"By section 5 all the powers of the company were vested in and could be exercised by the directors.     Clearly, under this authority no by-law can be established by the directors that does not conform to the laws of the State, and this whether the laws were in force when the amended charter was granted or came into operation afterwards. The power of the company for the regulation of its own affairs was thus in express terms subjected to the legislative control of the State.     The corporate power was a continuing one, and intended for the ordering of the affairs of the company as circumstances might, from time to time, require.     The reserved control by the State was also continuing in its nature, and manifestly intended for the protection of the public whenever, in the judgment of the legislative department of the government, the necessity should arise.

"Then follows the special provision on which the claim of a contract is predicated.     It is as follows:

"'The board of directors shall have power to establish such rates of toll for the conveyance of persons or property upon the same as they shall, from time to time, by their by-laws, determine, and to levy and collect the same for the use of the company.'"

. In commenting upon this the court said:

"Grants of immunity from legitimate governmental control are never to be presumed.     On the contrary, the

presumptions are all the other way, and, unless an exemption is clearly established, the legislature is free to act on all subjects within its general jurisdiction as the public interests may seem to require. As was said by Chief Justice Taney, speaking for the court, in *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 547: 'It can never be assumed that the government intended to diminish its power of accomplishing the end for which it was created.' This is an elementary principle. In *Chicago, etc., R. Co.* v. *Iowa*, 94 U. S. 155, *Peik* v. *Railway Co.*, Id. 164, and *Winona, etc., R. Co.* v. *Blake*, Id. 180, it was determined that 'a State may limit the amount of charges by railroad companies for fares and freights, unless restrained by some contract in the charter.' The right to a reversal of the present judgment rests on the question whether this company has any such restraining contract, and that depends on the effect to be given the amending section 6.

"The company, by its original charter, was authorized to transport passengers and property, and to receive compensation therefor. This, if there had been nothing more, would, under the rule stated in *Munn* v. *Illinois*, 94 U. S. 113, and the several railroad cases decided at the same time, require the company to carry at reasonable rates, and leave the legislature at liberty to fix the maximum of what would be reasonable. So that, laying aside the limitations of the old charter, the question here is whether the amending section relied on has the effect of taking away from the State this power of legislative regulation. * * * This is the form in which the power to charge and collect compensation for the carriage of persons and property was granted by the amended charter. The rates must be fixed by by-laws, and no by-law can be made that is at all repugnant to the laws of the State. The first paragraph of the section, with its proviso, prescribes generally what is necessary to the validity of a by-law, and the second allows the directors to fix rates by by-laws. It is undoubtedly true that the first paragraph neither adds to nor takes from the inherent power of a corporation to make by-laws for the regulation of its affairs, and that the proviso is nothing more than a legislative declaration of the principle of the common law that all by-laws must be reasonable, and not in conflict with the laws of the State. But the very fact that such a provision would have been implied adds to the significance of its incorpo-

ration in express terms into the charter, and manifests a determination not to leave room for doubt as to the right of the State to use its legislative power if necessary for the regulation of the affairs of the corporation, at least by the enactment of general laws applicable to all corporations of a like character and engaged in a like business. There is nothing which, even in the remotest degree, indicates that a by-law fixing rates is to be of a different character from those regulating the other business of the company. When, therefore, in a section of the charter which expressly declares that no by-law shall be made that is in conflict with the laws of the State, we find that the rates of charge to be levied and collected for the conveyance of persons and property are to be regulated by by-laws, the conclusion is irresistible that only such charges can be collected as are allowed by the laws of the State. This implies that, in the absence of direct legislation on the subject, the power of the directors over the rates is subject only to the common-law limitation of reasonableness, for, in the absence of a statute or other appropriate indication of the legislative will, the common law forms part of the laws of the State to which the corporate by-laws must conform. But since, in the absence of some restraining contract, the State may establish a maximum of rates to be charged by railroad companies for the transportation of persons and property, it follows that, when a maximum is so established, the rates fixed by the directors must conform to its requirements, otherwise the by-laws will be repugnant to the laws."

It is noticeable that in the present case we do not "find the section granting the power to fix rates by by-law in the same section that declares that by-laws shall not be in conflict with the laws of the State," nor do we find a mere general authority to fix rates, nor a mere mention of a maximum rate. In construing this charter we must, as in any other case, endeavor to ascertain the intent of the legislature, and we are of the opinion that sections 11 and 30 should not be held to qualify the unambiguous grant contained in section 15.

We have yet to consider the question whether the right which is claimed under section 15 has been lost by surrender. Counsel assert that it has been lost by reason of

respondent's acceptance of additional privileges under acts professedly or impliedly amendatory of its charter, and under the general railroad law; and, secondly, by reason of its consolidation with, or absorption of, the property and franchises of other railroad corporations of the State. It is said that in 1846 the Michigan Central Railroad Company became a corporation, with the right of perpetual succession, and the right to complete the half-finished railroad within the borders of this State, and to have a capital of $8,000,000; that at the present time the respondent has a continuous line through the States of Michigan, Indiana, and Illinois, and that it operates some and owns other railroads in this State, all of which it operates in conjunction with its own, the corporations owning which are said to have practically ceased to exist; that the roads are known to the public only as parts of the Michigan Central Railroad, and the companies which built them can only be reached through the Michigan Central; and that in some instances it owns the entire stock of such roads. We do not discover that it is asserted that the respondent's relations with these roads are unauthorized, and, if they were, we are not advised that the claim is made that the charter has been declared forfeited thereby. Our understanding of the claim is that, by drawing to itself these privileges and railroads, it has surrendered its rights under the original charter, and, through a consolidation, has become a new corporation, which, having come into existence since 1850, is subject to the powers reserved by the present Constitution.

In 1848, by Act No. 197, entitled " An act to amend an act entitled," etc. (describing the respondent's charter), the legislature extended the powers of the corporation theretofore formed, and authorized it to build and operate a railroad from the southern line of this State to Chicago. The charter, by section 36, reserved to the State the right to purchase the property of this company upon terms therein stated. Counsel say that the act of 1848 contained no saving clause as to the old charter, and that it

destroyed the option of the State to purchase under section 36, because it destroyed the basis of fixing the price. We think a sufficient answer to this is the question "whether the repeal of section 36, thereby depriving the State of the right to purchase, would have dissolved the corporation." It must be manifest that it would not, and we know of no authority to support the proposition that an enlargement of the powers of a corporation puts an end to its life, and at the same time creates another. To follow this suggestion to its logical consequence under the Constitution of 1850, it might be contended that an effort on the part of the legislature to increase the powers of a corporation would result in diminishing them by operation of law. We think the amendatory acts had no such effect as to dissolve the corporation, whether they were enacted before or after the adoption of our present Constitution, and that the act of 1855 (Act No. 139) authorizing the Michigan Central to build a double track, and to sell bonds therefor, and to make business contracts and arrangements with other railroads, organized or to be organized, for operation thereof by the Michigan Central Company, had no such effect.

It is urged that the necessary effect of that amendment was to amend the general railroad law, inasmuch as it necessarily gave the other companies powers of dealing that they did not have under the general railroad law; and that while, under the general railroad law, they could only consolidate, under this act they could make business contracts and arrangements which amounted to consolidation, though not technically called such, and that the act, if treated as enlarging the charter, was void. We need not concern ourselves, at this juncture, with the question of the validity of this legislation. The only question we are concerned about is whether the then existing Michigan Central corporation was dissolved by it, and whether a new one arose, Phœnix-like, from its ashes. One thing would seem obvious: If the amendatory act was void, as suggested, it could hardly dissolve one corpora-

tion or create another; if valid, we know of no authority which indicates that it must have the effect suggested. All of the acts purporting to amend the charter contain language indicating the right of the company to accept or reject such amendments, and they were accepted or rejected, as provided by the charter, and they all show an absence of the understanding by any one that they should destroy the existing or create a new corporation. This question was passed upon in the case of *Attorney General* v. *Joy*, 55 Mich. 107, where it was held that an act authorizing the Detroit & Pontiac Railroad to take a new name, and under that new name to extend its road from Pontiac to Lake Michigan, did not create a new corporation.

The general railroad law authorizes consolidation by all companies organized under it. We do not find it necessary to inquire whether the respondent could lawfully avail itself of those provisions if it were disposed. But, assuming that it might, has it done so by compliance with such provisions, or by a course of dealings which should be held to have had that effect? The law providing for consolidation clearly implies that the result of the statutory consolidation is a new corporation. See 1 How. Stat. § 3343. This is in accord with the majority of such statutes throughout the country, as will be seen by a comparison. Thomp. Corp. § 305. But this statute does not necessarily imply that the only arrangement for an extension of lines must come through a statutory consolidation, and other statutes permit arrangements of a different character to be made. We have already cited one, which was added to this charter by amendment. Laws 1855, Act No. 139. Undoubtedly, if a law points out a method by which railroads may consolidate, and provides that, upon compliance with such law, the consolidated companies shall constitute a new corporation, such new company could not deny the effect of its acts. It is not so clear that anything less than full or substantial compliance would enable it to claim new corporate rights. It is not

to be presumed that consolidation is favored. On the contrary, it is usual for legislatures to hedge the privilege about with conditions that tend to the preservation and encouragement of competition, and prevent the sacrifice of public interests through monopolies. In Elliott on Railroads (section 323) it is said:

"These enabling statutes are construed to authorize a consolidation only in cases where the companies seeking to combine come fairly within the terms of the statute. * * * Where the statute provides for the mode of consolidation, that mode must be substantially, if not strictly, pursued."

See *Rodgers* v. *Wells*, 44 Mich. 411; *Mansfield, etc., R. Co.* v. *Drinker*, 30 Mich. 124; *Peninsular R. Co.* v. *Tharp*, 28 Mich. 506.

The intention to consolidate may be an important consideration where the act is ambiguous or uncertain, and in Elliott on Railroads (section 324) it is said that "a clear intention to consolidate, together with the performance of acts reasonably appropriate to that end, must be shown in order to establish a consolidation," where the act is consistent with a different intent. Thus, the union of name, officers, business, and property does not, it has been held, change their distinctive character as separate corporations. *Nashua & Lowell Railroad* v. *Boston & Lowell Railroad*, 136 U. S. 356. The mere purchase by one railroad corporation of the franchise and property of another does not make the purchaser the successor, by consolidation, of the purchased road. Thus, in the case before us, the numerous arrangements by which the respondent manages, owns, or is otherwise interested in its several branch lines, and which are not shown in the record, may not amount to a consolidation in a general sense, or, if they do so, not in the sense of the statute. Where the statute is silent in regard to the effect of consolidation, a new corporation is not always the necessary consequence. "Succession is not necessarily consolidation, and a corpora-

tion may have authority to become the successor of another without having any authority to consolidate." Elliott, R. R. § 324. "If the merger is complete, it is evident that the one corporation is extinguished, *unless kept alive for certain purposes;* while it is equally clear that the other, in which it is merged, is not dissolved." Id. 335. See, also, Thomp. Corp. § 396, where it is said that the existence of a new corporation as the result of consolidation depends upon the legislative intent manifested in the statute under which the consolidation takes place. *Central Railroad & Banking Co.* v. *Georgia*, 92 U. S. 665. If there is no statute authorizing consolidation, the attempt is *ultra vires.* Elliott, R. R. § 322; Thomp. Corp. § 315, and cases cited. This case is unlike that of *Smith* v. *Railway Co.*, 114 Mich. 460. In that case the answer of the company to the order to show cause alleged that it had taken the steps prescribed by statute for the purpose of effecting a consolidation. In the present case there appears to be no such admission, and the record does not show that the Michigan Central has ever intentionally proceeded to effect a statutory consolidation. As said in Elliott on Railroads (section 335):

"The term 'consolidation' is an elastic one, and may include a union of two or more corporations into a new one, with a different name, with or without extinguishing the constituent corporations, or the merger of two or more corporations into another existing corporation under the name of the latter."

We have seen that the legislature has, by an amendment to the Michigan Central charter, authorized it to make business arrangements with other companies owning railroads. If so, it may enforce them. It may operate other roads, possibly buy their property or their stock. But if it be conceded that they cannot lawfully do these things, and therefore that their acts were *ultra vires,* are they not acts that subject them to a forfeiture of all rights through *quo warranto,* rather than a new grant of power

under consolidation acts which they have neither attempted to act under nor complied with in making business arrangements with other roads? In the list of charges against this respondent are to be found the extension of lines by building, the operation of other roads, the acquisition of all of the stock of some or the owning of other roads, the leasing of others for long terms, the increase of capital. If these things are *ultra vires*, it does not follow that a consolidation has been effected, or, if so, that it is a statutory consolidation, which has created a new corporation. If, on the other hand, these are valid arrangements, and lack the substantial requisites of the consolidation provided by statute, the stockholders of the Michigan Central Railroad Company are not thereby deprived of their charter rights. They have never assented to a consolidation. The company could not, as a new corporation, enforce collection of stock subscriptions, and could not compel the State to recognize it as a new corporation.

The further claim is made that, granting all of the foregoing, Act No. 90, Pub. Acts 1891, is to be treated as an exercise of the power of amendment reserved in the charter, and must be accepted and acted upon, subject to the right of the respondent to collect its damages from the State. We think this cannot be. The act does not purport to be an amendment of the charter, and no provision for compensating the respondent is contained in it. There is no provision of law for the payment of such claim, and the respondent would be powerless to enforce it.

We therefore reach the conclusion that the respondent had a vested right to fix its own tolls, and that to hold the act of 1891 applicable to it would be to impair the obligation of the contract made between the State and the company. To bring this company under the power of the State in the matter of the regulation of tolls, if desirable, must be done by the method pointed out in the charter. It would doubtless be a convenience to the public to enjoy the privilege of travel upon this line at a two-cent rate, either under this act or the act discussed; but it cannot be

accomplished, under this act, as to the line constructed. under the original .charter. The language of Mr. Justice Harlan in *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 673, is suggestive in this connection:

"If, in the judgment of the State, the public interests will be best subserved by an abandonment of the policy of granting exclusive privileges to corporations other than railroad companies, in consideration of services to be performed by them for the public, the way is open for the accomplishment of that result with respect to corporations whose contracts with the State are unaffected by that change in her organic law. The rights and franchises which have become vested upon the faith of such contracts can be taken by the public, upon just compensation to the company, under the State's power of eminent domain. [Citing cases.] In that way the plighted faith of the public will be kept with those who have made large investments upon the assurance by the State that the contract with them will be performed."

The order of the circuit court for the county of Wayne is reversed, with costs of both courts.

The other Justices concurred.